WEST END POTTERY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8158.   Promulgated August 1, 1927.

1. Petitioner purchased stock of another corporation in 1918 for $4,000 and in 1919 charged off that stock as worthless. *Held*, that in the absence of evidence as to the worthlessness of the stock, or as to the financial condition of the company, the stock of which is alleged to have become worthless, the cost thereof is not a proper deduction from gross income.

2. The evidence is insufficient to show that the petitioner is entitled to a greater amount of deduction for depreciation and obsolescence than was allowed by the Commissioner.

*William H. Vodrey, Esq.*, for the petitioner.
*J. L. Deveney, Esq.*, for the respondent.

This proceeding is for the redetermination of a deficiency in income and profits tax for the calendar year 1919 in the amount of $2,900.34.

The petitioner alleges that the Commissioner erred, first, in disallowing a deduction from gross income in the amount of $4,000 as a loss on account of certain corporation stock alleged to have been ascertained to be worthless and charged off in 1919; and second, in failing to allow as a deduction a reasonable amount for exhaustion, wear and tear and obsolescence of its pottery kilns.

### FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of Ohio, with its principal place of business at East Liverpool in that State. It has been in the pottery business for about 35 years, and its principal product has been table ware, known as Bisque China.

There were but few changes in the method of manufacturing that type of product until recent years. Until about the year 1917, practically all potteries used what are known as standing or intermittent kilns for the purpose of firing china. An intermittent kiln is constructed of brick, circular in form, about 12 feet in diameter and about 30 feet tall. The green ware, that is, unfired china, after being moulded, is carried into the kiln by men and placed in bundles, one on top of another, until the kiln is filled. In order to fill the kiln it is necessary for the men to climb ladders to place the china, as they approach the top.

After the kiln has been filled it is fired for a period of 40 to 72 hours. After the firing is completed, it is necessary to remove the china. The removal of the china necessitates a laborious process similar to that required to fill the kiln. A large quantity of fuel is consumed by that type of kiln.

The petitioner acquired its pottery in 1892, and the intermittent type of kiln has been used by it since that time. From time to time it made additions to its plant in the way of buildings as well as intermittent kilns, the last of which additions were made in 1910. Since 1910 it has remained practically the same.

Some time prior to 1917 a kiln known as the " tunnel " type was developed. It consisted of a brick tunnel erected above ground, and having a track for cars running through it. The plan of operating, or using that kiln is to heat, or " fire " the tunnel, and move the cars on which the green ware has been placed slowly through the tunnel.

The development of the tunnel type of kiln has revolutionized the pottery industry, by reason of the fact that its operation is much more economical than the use of the intermittent type. After 1917, no intermittent kilns were constructed by any of the pottery companies, of which there are about 35 in the East Liverpool district.

In the year 1921 or 1922, the first tunnel kiln was constructed and put in operation in the East Liverpool district. Since 1917 there has been considerable development in machinery used in the pottery industry. Modern machinery is more efficient and economical than the kinds formerly used.

In the year 1917, petitioner's officers realized the fact that due to the development of the tunnel kiln, it would be compelled to change its method of production in order to meet competition. With that idea in mind, it began in 1918, to charge off for depreciation and obsolescence, on account of its intermittent kilns, and its machinery, $10,000 per year, so that under that program by the year 1925 it would have charged off $70,000, leaving a salvage value $6,188.59, the kilns and machinery having in the estimation of petitioner in the year

1918, a value at that time of $76,188.59. By reason of the great demand for its products, during the year 1918, the petitioner was able to operate its plant with the facilities it then had and meet competition.

Petitioner's principal difficulty in 1918 was to procure coal to fire its kilns. In order to obtain coal from the Rachel Coal Co., it purchased stock of that company at a cost of $4,000, which stock it held until 1919, at which time it tried to sell the stock to the Rachel Coal Co. and to other parties, but was unable to effect a sale. Without making any investigation as to the financial condition of the Rachel Coal Co. or as to what assets it owned, the petitioner charged off in 1919 the cost of said stock on the theory that the stock was worthless. The stock, the cost of which was so charged off, was soon thereafter assigned by it to its secretary and treasurer.

The petitioner has continued to operate its plant to the present time, and no part thereof has been abandoned or replaced. It is still using the intermittent kilns. In 1923, 1924, and 1925, petitioner suffered losses in the operation of its pottery plant.

Upon the audit of petitioner's return for 1919, the Commissioner disallowed as a deduction from gross income, for that year, $4,000 taken by petitioner on account of the alleged worthless stock of the Rachel Coal Co. Also the respondent denied the allegation that he had not allowed as a deduction from gross income for the year 1919, a reasonable amount on account of depreciation including obsolescence of petitioner's kiln, machinery and equipment. No evidence was introduced to show what amount, if any, the Commissioner had allowed. The deficiency notice containing the Commissioner's computation was not attached to the petition, nor was it offered in evidence.

### OPINION.

Love: The first issue in this case is whether or not the stock of the Rachel Coal Co. purchased by petitioner in 1918, at a cost of $4,000 was worthless in 1919 so as to justify the petitioner in deducting the cost thereof as a loss in that year.

The petitioner's evidence precludes us from sustaining its contention. The petitioner's secretary and treasurer testified to the effect that no attempt was made to determine the financial condition of the Rachel Coal Co. For aught the record shows, the stock was worth a hundred cents on the dollar. The mere fact that the stock found no ready market, or that the Rachel Coal Co. would not buy it in, certainly does not establish that it was in fact worthless and that fact must first be ascertained before the petitioner can, under the statute, claim a deduction of the cost thereof as a loss. *Appeal of T. J. Donahoe*, 2 B. T. A. 355.

The determination of the Commissioner in disallowing that deduction is, therefore, sustained.

With respect to the contention made by the petitioner that the Commissioner did not, for the year 1919, allow it a reasonable amount as a deduction for depreciation and obsolescence of its kilns and machinery, we must also approve the determination of the Commissioner.

In the respondent's answer filed in this proceeding, it is alleged that he " denies that the Commissioner refused to allow a reasonable amount for depreciation on an old style, upright, intermittent kiln pottery," and he further " denies generally and specifically each and every allegation contained in the taxpayer's petition not hereinbefore admitted, qualified or denied."

The deficiency notice, with computation, which forms the basis of this proceeding was not attached to the petition, nor was there any evidence introduced to show what allowance, if any, the Commissioner made for depreciation and obsolescence. Without knowledge of what allowance for depreciation and obsolescence was made by the Commissioner, we are unable to do otherwise than approve his determination, whatever that may have been. The burden of showing that the Commissioner erred is on the petitioner. *Appeal of Rock Spring Distilling Co.*, 2 B. T. A. 207. However, had the petitioner offered evidence as to the amount of depreciation taken by it for 1919, on its kilns and machinery, and disallowed by the Commissioner, there would still exist, in the present condition of the record, an insurmountable difficulty which of itself precludes our disturbing the determination made in this respect by the Commissioner.

In order that depreciation may be allowed, it is necessary in addition to knowing the useful life of the depreciable assets, to have established the cost or March 1, 1913, value of such assets. *Appeal of When Clothing Co.*, 1 B. T. A. 973. The burden of proof in respect of those matters is on the petitioner. *Appeal of Valley Steamship Co.*, 1 B. T. A. 1107. In this proceeding the petitioner has proved that in 1918 it estimated the net value of its depreciable assets, at that time, at $76,188.59. The record is silent as to the March 1, 1913, value of those assets owned by the petitioner at that time. Likewise, the record is silent as to the cost of any depreciable assets acquired subsequent to March 1, 1913, and prior to 1918. It is obvious, therefore, that in view of the condition of the record, we can not disturb the Commissioner's determination in respect to depreciation and obsolescence. *Appeal of William Harris, Jr.*, 2 B. T. A. 156.

*Judgment will be entered for the respondent.*

Considered by SMITH and LITTLETON.